UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                       :

PAULINO VALENZUELA,            :

                 Plaintiff,     :

                                         :      06 Civ. 903 (DLC)

           -v-                   :

                                         :      <u>OPINION AND ORDER</u>

RIVER BAY CORPORATION and UNION, LOCAL   :
32BJ,                                    :

                 Defendants.    :

                                         :
----------------------------------------X

Appearances:

For <u>Pro Se</u> Plaintiff:
Paulino Valenzuela
120 Casals Place, Apt. 29A
Bronx, NY 10475

For Defendant Riverbay Corporation:
Joseph A. Saccomano
Mary A. Smith
Jackson Lewis LLP
One North Broadway, Suite 1502
White Plains, NY 10601

DENISE COTE, District Judge:

     Plaintiff Paulino Valenzuela ("Valenzuela") brings this <u>pro se</u> action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) <u>et seq.</u>, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 <u>et seq.</u>, to recover damages for discriminatory termination of his employment and retaliation. Plaintiff claims that defendant Riverbay Corporation ("Riverbay") discriminated against him on the basis

of his national origin and partial disability by terminating his employment as a porter at a Bronx residential building. Riverbay has filed a motion for summary judgment, arguing that Valenzuela's employment was terminated for violent and threatening behavior towards co-workers and supervisors. For the following reasons, Riverbay's motion for summary judgment is granted.

BACKGROUND

The following facts, drawn from the record the parties have presented on summary judgment, are undisputed or taken in the light most favorable to the plaintiff, unless otherwise indicated. Valenzuela is proceeding <u>pro se</u>, and therefore his submissions are construed liberally.[1]

---

[1] Valenzuela has not submitted a Local Rule 56.1 Statement in opposition to the instant motion. His sole submission consists of eleven separate pages of unsworn statements and several exhibits attached to a one-page sworn letter. Riverbay contests the submission on the grounds that unsworn statements may not raise a material issue of fact if none exists on the basis of sworn testimony in a case. Since the plaintiff is proceeding <u>pro se</u>, the sworn letter is construed as incorporating the unsworn statements and exhibits attached to it for the purposes of the present motion.

Valenzuela's submissions are in English although he speaks only Spanish and has required the assistance of a translator at his deposition and in hearings before this Court. Plaintiff's submissions do not indicate how or when his statements were translated.

2

Riverbay, also known as Co-Op City, is a residential housing cooperative in the Bronx consisting of thirty-five high rise buildings and seven townhouse clusters.  From 1994 to 2005, the plaintiff, a native of the Dominican Republic and self-identified "Hispanic" or person of "Spanish" descent, worked in the janitorial division of Riverbay's Building and Grounds Department ("Department").  For most of this period, Valenzuela worked as a porter assigned to one of the cooperative's buildings and was responsible for cleaning the lobby area on certain days and maintaining the basement laundry room on other days.  From 1999 to 2005, the plaintiff served as a lobby attendant with some basement maintenance duties and worked Friday through Tuesday of each week.  After his first disciplinary problem in 2000, Valenzuela was assigned to Building 26 of Riverbay Section 5.  James Sutter ("Sutter") served as his immediate supervisor during weekend shifts for the entire period of his employment with Riverbay.  His weekday supervisor was first David Mansary ("Mansary") from 1999 to 2002, and then Audley Bent ("Bent") from 2002 to 2005.  Sutter, Mansary and Bent reported directly to Luis Salazar ("Salazar"), an Hispanic male and head of the janitorial division of the Department.  Phil Zudrima ("Zudrima") also served as a supervisor to the plaintiff.[2]  Donovan Plummer ("Plummer"), an

---

[2] The parties have not offered evidence as to Zudrima's position

African American, was the supervisor of the Department's other unit, the grounds division.  From 1994 to 2000, the plaintiff had no disciplinary problems at Riverbay and in 1996, received a certificate of appreciation for exemplary service.

A. Maldonado Incident

In March 2000, plaintiff was suspended for two days for allegedly threatening an Hispanic co-worker, Jesus Maldonado ("Maldonado"), in Riverbay Building 13.  Maldonado submitted a written report dated March 10, 2000, alleging that when he "asked [Valenzuela] to move to the back of the dumpster so [Valenzuela] could push for a while [sic]," the plaintiff hit him in the arm.  After the two men pushed each other, Valenzuela purportedly told Maldonado to "walk with fear" and that he would not "pass the day without dying."  Valenzuela denied these accusations.  Plummer issued Valenzuela an Employee Disciplinary Action Report ("DAR") for "improper conduct" and "threatening [an]other employee" and suspended him from work on March 16 and 17.[3]  The plaintiff appears to claim that Maldonado falsely reported that Valenzuela threatened him after Valenzuela

_____

at Riverbay or the relationship between his position and that of Valenzuela's other supervisors.

[3] The March 2000 DAR does not indicate that Valenzuela received or read the report.

reported that he, Maldonado, and another Riverbay employee improperly placed a crystal and aluminum frame in the doorway of the porter's room.

Plummer issued Valenzuela another DAR on March 23 for failing to call or appear at work on March 11 and 15. Valenzuela was suspended for two days.  Valenzuela did not file grievances to contest the March 10 or March 23 DARs.

B. Termination and Reinstatement

On April 6, Maldonado filed a report with the Riverbay Department of Public Safety contending that on March 31, an unknown Hispanic male warned him that Valenzuela had offered him $1,200 to harm him in retaliation for his March 10 complaint. Maldonado also reported the incident to his shop steward from the Service Employees International Union, Local 32BJ ("Union"), and the local police.  Valenzuela denied the allegation and claimed that Maldonado was lying.[4]  Riverbay immediately fired the plaintiff for hiring a third party to inflict bodily harm on Maldonado.  The Union filed a grievance and request for arbitration on Valenzuela's behalf.  The arbitration proceeding

---

[4] Valenzuela testified that Maldonado "had big support because he was the boss' son-in-law."  Maldonado is married to the daughter of Angel Rosario, whom Valenzuela has identified as a Riverbay supervisor without explaining the nature of his position within the Building & Grounds Department.

was conducted in accordance with the terms of the collective bargaining agreement between the Union and Riverbay.  Four of Valenzuela's co-workers testified against Valenzuela, describing incidents that occurred while they were working with him. Although Valenzuela admitted that he had incidents with other workers, he stated that "they worked well together afterwards."

The arbitrators' June 26, 2000 Opinion and Award reinstated Valenzuela without backpay on the grounds that Maldonado's "hearsay evidence" was "not credible" and did not meet the level of proof required to form the basis of a discharge.  It also noted that investigation of the incident had failed to identify the "stranger" and that a witness who allegedly had heard the threat reported to the police that he had not heard anything. The arbitrators issued Valenzuela a "last and final warning" that any further conduct along the lines of the incidents described by his co-workers "may be of greater permanency or termination."


C. Zudrima Incident

Zudrima submitted a written report on May 8, 2001, alleging that he found Valenzuela drinking beer during work hours in the basement of a Riverbay building.  Zudrima also contended that when he asked Valenzuela if he was drinking, the plaintiff followed him with a broom and made threatening remarks.

Witnesses corroborated that Valenzuela was drinking beer on duty, but did not indicate that they witnessed the alleged threat.  Valenzuela has testified that Zudrima's written submission was false, that he did not threaten Zudrima and that he had not been drinking beer while on duty.[5]  On May 23, Plummer issued Valenzuela a DAR for consuming alcohol while on duty, improper conduct, and threatening behavior.  The plaintiff was immediately suspended for two weeks and given a final warning. Valenzuela did not file a grievance to contest the DAR.

D. Bent Incident

Several years later, on September 30, 2004, Plummer issued Valenzuela a DAR for improper conduct for allegedly using "foul language" "in a threatening way" with his supervisor, Bent, on September 23.  After a two day suspension, Valenzuela returned to work.[6]  He did not file a grievance or otherwise challenge the DAR.

---

[5] Valenzuela testified in his deposition that he was drinking a "bitter drink" for a stomach ache.  In his written submission in opposition to the instant motion, he stated that he had been drinking seltzer water to calm an upset stomach.

[6] The September 30, 2004 DAR, did not report that Valenzuela threatened or engaged in violence.

E. Sutter Incident

Valenzuela requested a transfer from Building 26 to Building 17, which Salazar approved in February 2005.  According to Riverbay policy, upon transfer, a porter is permitted to take his personal items and cleaning supplies from one locker in his former building to his newly assigned building.  Lozada accompanied Valenzuela to move his personal items and cleaning supplies under Sutter's supervision on Saturday, February 19. Lozada waited for Valenzuela upstairs while the plaintiff entered the locker room.

The parties contest the precise statements and events that transpired while Valenzuela removed items from his lockers. Valenzuela asserts that he kept $1,665 in his locker and that no one at Riverbay knew of the money.  He began removing items from a locker when Sutter entered the room.  Sutter observed the plaintiff remove items from two lockers and a file cabinet,[7] and told the plaintiff in English that he could only take one

---

[7] In his written statement submitted after the incident, Sutter stated that Valenzuela "had about two lockers and a file cabinet with Riverbay supplies in it."  In his affidavit in support of defendant's motion, he testified that "I saw that [Valenzuela] was removing Riverbay cleaning items from two lockers and a file cabinet."  While Sutter's testimony and written statement consistently indicate that he saw Valenzuela remove cleaning items from a file cabinet, they are inconsistent as to whether the plaintiff sought to remove personal items or Riverbay cleaning products from the two lockers.

locker's worth of cleaning supplies with him.[8]  The plaintiff
told Sutter he did not speak English or understand what he was
saying.  Sutter called Lozada on the radio and asked him to come
downstairs to translate.  After Lozada arrived, he translated
Sutter's statement.  Lozada testified that he told Valenzuela
that he could only take one locker's worth of Riverbay cleaning
supplies to his new building.  Valenzuela testified, however,
that Lozada stated, "Jimmy [Sutter] called me on the radio. . .
.  He told me to tell you that [sic] not to take more than one
box."[9]  Valenzuela protested, "If I don't take these three boxes,
I'm leaving everything here."  According to the plaintiff,
Lozada and Sutter told him to "take everything back" and he
complied.

    Sutter and Lozada testified that after Lozada translated
Sutter's instruction, Valenzuela passed Sutter in the doorway,
lifted his elbow and hit Sutter's jaw.  Valenzuela testified
that "there is no way" that his elbow could have made contact

---

[8] In his written statement submitted after the incident, Sutter's
description of his statement to the plaintiff was more
ambiguous.  He reported that he told the plaintiff in English
that "he could only take one locker and the file Cabinet had
Riverbay supplies in it."

[9] The parties disagree as to whether Lozada's translation
indicated that Sutter instructed Valenzuela to only remove one
box of personal items, or to only remove one locker full of
Riverbay cleaning products.

with Sutter's chin and that Sutter told Lozada, "Tell Valenzuela
that he hit me with his elbow."


F. Final Termination

Sutter reported the incident to Salazar the following
Monday, February 21.  In his written statement, Sutter claimed
that Valenzuela was upset because Sutter had told him that "he
could only take one locker," and that Valenzuela's elbow hit him
on the chin.  Sutter's written statement alleged that as
Valenzuela carried a water cooler out of the locker room, he
passed by Sutter who was standing in the door, "threw his elbow
at my jaw and hit me in the chin."  Lozada submitted a written
statement alleging that after an argument, "Valenzuela all of a
sudden lifted his arm toward Mr. Sutter [sic] chin."[10]

Based on Sutter and Lozada's written reports, Salazar
decided to fire Valenzuela immediately for his repeated
violation of Riverbay's workplace violence policy.  He was aware
that Valenzuela has received prior counseling for violent and
threatening behavior towards co-workers and supervisors at
Riverbay.  He did not confer with anyone about his decision.  At

---

[10] Valenzuela testified that he was not carrying a water cooler
out of the room while Sutter was there, never had a problem with
Sutter during his years of service for Riverbay, described
Sutter as a "father," and stated that he has always had respect
for him.

10

the time of this decision, Salazar was not aware that plaintiff suffered from any vision or hearing impairment, nor was he aware of any complaint by the plaintiff that he had suffered discrimination at Riverbay.

Valenzuela did not work on Monday and Tuesday.[11] On Wednesday, February 23, Salazar met with him in the presence of his shop steward, Obed Ortiz ("Ortiz"), to advise him that he had decided to terminate Valenzuela's employment and that the matter would be scheduled for a Human Resources hearing later that day.  In accordance with the applicable collective bargaining agreement, the plaintiff and his shop steward then met with Sutter, Lozada, Plummer, Salazar, and Ronald Caesar ("Caesar"), Riverbay's then Acting Director of Human Resources, and others, to review the firing decision.  At the hearing, Valenzuela denied that his elbow made contact with Sutter's chin.  Sutter explained his version of the events and Lozada confirmed that Valenzuela's elbow hit Sutter's chin.

Based on Lozada's corroboration of Sutter's allegations, and the fact that the plaintiff had already received three DARs for inappropriate, violent and threatening behavior, Caesar approved Salazar's decision to terminate Valenzuela's employment

---

[11]  Salazar testified that Monday and Tuesday were the plaintiff's regularly scheduled days off.  Valenzuela stated that Monday was a holy day and that he was out sick on Tuesday.

on February 23.  At the time of his decision, Caesar was unaware that Valenzuela suffered from any vision, hearing or other impairment.  That day, Riverbay's Human Resources Department sent the Union a letter explaining the decision to terminate Valenzuela's employment.

On February 24, Valenzuela was issued a DAR for threatening or engaging in violence, improper conduct, and dishonesty/theft. The DAR ordered the immediate termination of Valenzuela's employment.  That day, Riverbay notified the plaintiff by letter that his employment was terminated as of February 23 and laid out the grounds for the decision, which included the February 19 incident; the September 23, 2004 suspension for foul language used in a threatening manner; and the March 10 and 31, 2000 suspensions for threatening other employees.  The Union declined to file a grievance or request for arbitration after the plaintiff's employment was terminated.

G. Discrimination Complaint

Valenzuela has submitted two March 2005 letters written by residents of Co-op City describing his work as "attentive and conscientious."  He claims that negative reports in his employment record are the result of discrimination, rather than his conduct toward co-workers or supervisors.  Valenzuela shared

this belief with co-workers, but not with "an office."[12]  After

his firing, the plaintiff reported what he believed to be the

unjust circumstances of his termination to the Union on six

different occasions.  On March 22, 2005, the Union directed him

to file a complaint with "the 19th floor."[13]  When he tried to do

so, he was told his case was closed.

Valenzuela alleges in opposition to the instant motion that

he has faced discrimination by Plummer and Bent who "hate the

Hispanic or latinos."[14]  The plaintiff claims that Plummer was

behind all of his suspensions.  He argues that since the

Riverbay administration "changed" in 1999, the company began

discriminating against Hispanic workers and making their lives

"impossible."  He also complains that on February 28, Plummer

and other employees broke the chain on his locker and removed

his personal property as an act of discrimination.  As an

example of Bent's discrimination against him, Valenzuela alleges

that he was suspended from work January 3 through 18, 2005,

after Bent purportedly accused him of improperly touching a

woman.  Neither party has submitted evidence other than

---

[12] Valenzuela has not named the co-workers with whom he shared
this belief, or explained when he did so.

[13] The parties have not offered evidence to explain the nature of
the office on the 19th floor.

[14] Plaintiff's statement in a May 15, 2007, unsworn declaration.

Valenzuela's unsworn statement about the accusation, resulting

investigation, or suspension.

Valenzuela emphasizes that he did not hit Sutter with his

hands.  He claims that he has proof in the form of a tape and

pictures showing that he was the victim of discrimination and

that Sutter "has been following him in many occasions."[15]  He

also states, "[T]hey always look [sic] me with bad eyes.

Everything happened with the administration of DONAVAR [sic]

PLUMMER."

---

[15] Valenzuela states that he recorded two tapes, one on the
morning of February 23, 2005, and another on the morning of
February 24, 2005, that provide evidence that Sutter and
Lozada's descriptions of the February 19 incident are false.
Valenzuela also claims that the pictures depict work that he was
forced to do on behalf of others and the February 28 incident in
which Bent and Plummer "broke [his] boxes" to retrieve his
property.  In reply on the instant motion, the defendant notes
that it did not receive the tape or pictures to which Valenzuela
refers.
    On November 27, 2006 and January 17, 2007, plaintiff sent
to the Court materials including historical documents,
photographs, a mini cassette tape, and copies of documents
recently produced to defendants, including plaintiff's income
taxes, unemployment benefits ledger, and earnings statements.
These materials may include the cassette tape and photographs to
which plaintiff refers in his opposition.  A January 18, 2007
Order returned these materials to the plaintiff, reiterating
that all correspondence to the Court was to be addressed to this
Court's Pro Se Office.  After this directive, plaintiff sent
chambers additional materials, which were received on March 14,
without proof of service on the defendant.  A March 15 Order
returned these materials to the plaintiff, indicating again that
documents sent to the Court without adequate proof of service
would be returned and that all correspondence was to be sent to
the Pro Se Office.

Valenzuela contends that the following Riverbay employees were treated better than him: Antonio Suazo ("Suazo"), Esteve Trozzo ("Trozzo"), Vernon Cooper ("Cooper"), Caesar, and Plummer.  He asserts that Caesar and Cooper are African American, and that Trozzo and Plummer are white.  Valenzuela identifies Cooper as a Riverbay supervisor.  Suazo has been employed as a porter in Riverbay's Building and Grounds Department since May 1988.[16]  During the entire period of his employment, Suazo received one DAR dated January 24, 2002, for lack of cooperation or teamwork and violation of company rules or policy due to his failure to report to work in an emergency or weather related occurrence.  Trozzo was employed as a porter in Riverbay's Building and Grounds Department from May 1984 until his death on December 20, 2005.  During this time, he received one Employee Disciplinary Report dated April 15, 1996 for poor performance.  Neither Suazo nor Trozzo were counseled for or involved in any violent or threatening behavior during their employment at Riverbay.

---

[16] A question of fact exists as to Suazo's national origin. While plaintiff has offered his own unsworn statement that he is African American, the defendant contends that he is Hispanic.

H. Visual and Hearing Impairment

On April 6, 2002, Valenzuela was injured on the job and suffered impairment to his vision, including the gradual loss of vision in one eye.  He reported the incident sometime between April 8, 2002 and February 19, 2003,[17] but continued to work after the injury.  He was not placed on limited duty as a result of any loss of vision.  Valenzuela's visual impairment does not prevent him from obtaining new employment and he is able to read and to watch television with one eye.

While working at Riverbay, Valenzuela had no problems hearing.  After February 2005, he obtained and began wearing a hearing aid.  Valenzuela also reports that he underwent surgery for a hernia due to heavy lifting on the job, but does not describe this condition as related to any disability.

---

[17] Valenzuela has offered contradictory testimony as to the date he first reported that he suffered a visual impairment due to a workplace injury.  The plaintiff first testified that he reported the injury on April 8, 2002, several days after the accident.   During his deposition, defense counsel presented Valenzuela with an accident report dated February 19, 2003, and asked if the report was the first time he reported his injury to Riverbay.  The plaintiff testified that he "let several weeks go by" after the accident before making a report.  If the deposition resolved the issue of when Valenzuela first reported his visual impairment, that portion was not submitted on the instant motion.

I. Procedural History

On December 13, 2005, the plaintiff filed a complaint with the New York State Division of Human Rights regarding Riverbay's allegedly discriminatory conduct.  He also reportedly filed a Charge of Discrimination with the EEOC against Riverbay that same day.  On December 18, 2005, the EEOC issued Valenzuela a right to sue letter, closing its investigation on the ground that it was unable to conclude that the information it had obtained established a violation of Title VII or the ADA and granting the plaintiff the right to file a lawsuit against Riverbay within 90 days of his receipt of the letter.

Valenzuela filed his complaint in this action on February 6, 2006, naming only Riverbay as a defendant.  On August 15, plaintiff filed an amended complaint adding the Union as a defendant.  Following the Union's motion to dismiss, the Union was dismissed from this action on January 31, 2007, for plaintiff's failure to state a claim against it.  Valenzuela v. Riverbay Corp., No. 06 Civ. 903 (DLC), 2007 WL 414487 (S.D.N.Y. Jan. 31, 2007).  Riverbay moved for summary judgment on April 19.  The motion was fully submitted on May 30.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue

17

as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).  When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings.  Fed. R. Civ. P. 56(e); accord Sista, 445 F.3d at 169.  Only disputes over material facts, facts that might affect the outcome of the suit under the governing law, will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

I. Discrimination on the Basis of National Origin

The plaintiff claims that his employment was terminated due to discrimination on the basis of his Hispanic national origin.[18]

---

[18] In one instance in his opposition to the instant motion, the plaintiff also claims that his poor disciplinary record was the result of discrimination on the basis of national origin.  The complaint did not identify any adverse employment action other

Claims of disparate treatment under Title VII are analyzed using the burden-shifting framework set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).  The plaintiff bears the initial burden of establishing a prima facie case of discrimination.  Williams v. R.H. Donnelley Corp., 368 F.3d 123, 126 (2d Cir. 2004).  A plaintiff's burden in presenting prima facie evidence of discriminatory treatment is "minimal," McPherson v. New York City Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006), but the plaintiff must nonetheless establish that

> (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class.

Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005).

---

than termination of employment.  An adverse employment action is a "materially adverse change in the terms and conditions of employment.  To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (citation omitted).  Such changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Id. (citation omitted).  Plaintiff's receipt of DARs and suspensions are not considered adverse employment actions for the purposes of this motion.  Valenzuela did not give notice to Riverbay that his lawsuit was brought on this theory and the defendant has not had an opportunity to contest the viability of such a claim on the ground, inter alia, that it would be time-barred.

With respect to the fourth element of the <u>prima facie</u> case, a plaintiff may meet his burden of establishing an inference of discriminatory intent through a number of means, including the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge. <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 468 (2d Cir. 2001) (citation omitted). If the plaintiff seeks to carry this burden by "showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group, . . . [he] must show [he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [him]self." <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 379 (2d Cir. 2003) (citation omitted). "A plaintiff is not obligated to show disparate treatment of an identically situated employee" when presenting <u>prima facie</u> evidence of discrimination, but the object of comparison "must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." <u>McGuinness v. Lincoln Hall</u>, 263 F.3d 49, 54 (2d Cir. 2001). "Ordinarily, the question

whether two employees are similarly situated is a question of fact for the jury." <u>Mandell</u>, 316 F.3d at 379.

If the plaintiff succeeds in making this <u>prima facie</u> showing, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason that motivated the adverse employment action. <u>McPherson</u>, 457 F.3d at 215-16. The defendant's burden is "one of production, not persuasion." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142 (2000). If the employer meets its burden, "the burden shifts back to the plaintiff to prove discrimination, for example, by showing that the employer's proffered reason is pretextual." <u>Demoret v. Zegarelli</u>, 451 F.3d 140, 151 (2d Cir. 2006). In this case, the defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." <u>Joseph v. Leavitt</u>, 465 F.3d 87, 90 (2d Cir. 2006). The ultimate question is whether the evidence, viewed in the light most favorable to the plaintiff, would support a finding "that the defendant intentionally discriminated against the plaintiff." <u>Reeves</u>, 530 U.S. at 143.

The plaintiff has failed to establish the fourth prong of the <u>prima facie</u> case. The plaintiff has not offered evidence to suggest that Salazar's decision to terminate his employment on February 23 was motivated by his national origin. While he

alleges that Plummer and Bent "hate" Hispanics, he has not
offered any evidence of their acts or statements to support this
accusation.  In any event, the plaintiff has not shown that
either of these supervisors took part in Salazar's decision to
recommend Valenzuela's firing after the February 2005 Sutter
incident.[19]

Although there remain questions of fact as to Sutter's
statements, Lozada's translation of these statements, and
Valenzuela's actions on February 19, any question as to the
events of that day are not material to the question of
discrimination.  Salazar recommended that Valenzuela be fired
after considering Sutter and Lozada's written and oral reports
of what transpired on February 19.

Moreover, Valenzuela's attempt to establish an inference of
discrimination by identifying the more favorable treatment of
Suazo, Trozzo, Cooper, Caesar or Plummer fails.  The plaintiff
has not demonstrated that any of these employees "shared
sufficient employment characteristics with [him] so that they
could be considered similarly situated."  McGuinness, 263 F.3d
at 53.  While Suazo and Trozzo, like the plaintiff, have both
been employed as porters at Riverbay, Valenzuela has not offered

---

[19] Although Plummer signed all but the last DAR issued to
Valenzuela after the February 19 incident, Valenzuela does not
contest his receipt of DARs as adverse employment actions, as
noted above.

evidence to show that they accumulated the same history of disciplinary infractions. Suazo and Trozzo have significantly better disciplinary records than the plaintiff. Caesar, Plummer and Cooper not only occupy higher positions than the plaintiff at Riverbay, Valenzuela has not shown that they were appointed to those positions in spite of accumulating a similar string of accusations for threatening behavior. Indeed, he has not submitted any evidence that they were ever disciplined.[20] As a result, Valenzuela has failed to demonstrate that any of the five comparators are "similarly situated [to him] in all material respects." Id. at 54.

For the same reasons that the plaintiff has not met the de minimis burden of establishing an inference of discrimination, he has failed to raise a question of fact as to whether the decision to fire him was the result of prohibited discrimination. The defendants have certainly identified legitimate cause for the termination of Valenzuela's employment, which shifted the burden to Valenzuela to present evidence of discrimination. Summary judgment is therefore granted on the plaintiff's claim that he suffered discrimination on the basis of national origin.

_____

[20] The plaintiff's opposition alleges that Maldonado and Zudrima falsely accused him of the acts for which he was disciplined, but does not assert that their false accusations were motivated by discrimination or that either individual was linked to the final decision to terminate his employment.

II. Title VII Retaliation

In his complaint, Valenzuela alleges that he was discharged as a result of retaliation.[21]  To succeed on a retaliation claim, the plaintiff must show that the alleged adverse action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d 199, 207 (2d Cir. 2006) (citation omitted).  Retaliation claims, like other Title VII claims, are evaluated under a three-step burden shifting analysis.  Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).  First, the plaintiff must make out a prima facie case; second, the defendant must articulate a non-retaliatory reason for the action; third, if the defendant meets its burden, the "plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." Quinn v. Green Tree Credit Corp., 159 F.3d 759, 764 n.5 (2d Cir. 1998) (citation omitted).  In the third step, "the presumption of retaliation dissipates and the employee must show that retaliation was a

---

[21] Title VII forbids retaliation against an employee for opposing any practice made unlawful by the statute.  42 U.S.C. § 2000e-3(a).  Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [such employee] has opposed any practice made an unlawful employment practice by this subchapter . . . ."  42 U.S.C. § 2000e-3(a).

substantial reason for the adverse employment action." Jute,
420 F.3d at 173.

In order to establish a prima facie case of retaliation, an
employee must show "(1) participation in a protected activity;
(2) that the defendant knew of the protected activity; (3) an
adverse action; and (4) a causal connection between the
protected activity and the adverse employment action." Id.
(citation omitted).  With respect to the second prong of the
prima facie case, general corporate knowledge suffices.
Kessler, 461 F.3d at 210.  The plaintiff is required to make
only a minimal showing to meet the fourth prong of the prima
facie case.  "The plaintiff's burden at the beginning of the
case is a light one, usually demanding only that the protected
activity preceded the adverse action in order to satisfy the
causation requirement." Raniola v. Bratton, 243 F.3d 610, 624
(2d Cir. 2001).  Temporal proximity between the protected
activity and the employer action can support an inference of
causation.  Feingold v. New York, 366 F.3d 138, 157 (2d Cir.
2004) (two-week gap).

The plaintiff has failed to offer proof that he engaged in
protected activity.  Valenzuela has not shown that he expressed
to any supervisor, member of Riverbay management, or any
official in the Union his belief that his various suspensions or
any other aspect of his employment with Riverbay resulted from

discrimination against him on the basis of his national origin
or disability.  While Valenzuela contends that he shared this
sentiment with co-workers, he has failed to identify any
specific co-workers whom he told, the dates on which he told
them, or the circumstances in which his expressed concern might
have reached someone with sufficient responsibility to create
general corporate knowledge.  Valenzuela's retaliation claim is
dismissed for failure to satisfy the first, second, and fourth
prongs of the prima facie case.

## III. Disability Discrimination

The complaint alleges that the plaintiff suffered
discrimination on the basis of "partial disability,"
specifically, "visual and hearing impairment."  The ADA
prohibits discrimination against a "qualified individual with a
disability because of the disability" in the "terms, conditions,
and privileges of employment."  42 U.S.C. § 12112(a).  In order
to sustain his claim, the plaintiff must offer evidence that:
(1) the defendant is covered by the ADA; (2) he suffers from or
is regarded as suffering from a disability within the meaning of
the ADA; (3) he was qualified to perform the essential functions
of the job, with or without reasonable accommodation; and (4) he
suffered an adverse employment action because of his disability

or perceived disability.  Capobianco v. City of New York, 422
F.3d 47, 56 (2d Cir. 2005).

The ADA defines a disability as "(A) a physical or mental
impairment that substantially limits one or more of the major
life activities of such individual; (B) a record of such an
impairment; or (C) being regarded as having such an impairment."
42 U.S.C. § 12102(2) ("Section 12102(2)").  The existence of a
disability must be determined on a "case-by-case" basis.  Toyota
Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002);
Capobianco, 422 F.3d at 56.  Not every impairment is a
disability for the purposes of the ADA; the impairment must both
limit a major life activity and also be substantial.
Capobianco, 422 F.3d at 56.  In order to qualify as having a
disability under Section 12102(2)(C) the employer must do more
than perceive the employee as somehow disabled; the "employer
must regard the employee as disabled within the meaning of the
ADA."  Id. at 57 (citation omitted).

Valenzuela has failed to produce any evidence raising a
question of fact as to whether he is disabled within the meaning
of the ADA or whether Salazar or Caesar, the officials who made
the decision to terminate his employment, or even anyone who
participated in the decision, were aware of any purported
disability.  While his complaint alleges that he suffers visual
and hearing impairments, Valenzuela's own testimony confirms

that he himself did not perceive any problem with his hearing while working at Riverbay and secured a hearing aid only after his discharge.  Nor has Valenzuela raised a question of fact as to whether his visual impairment constituted an ADA-protected disability.  He has not offered evidence to show that his visual impairment either limited a major life activity or was substantial.  Nor has he offered proof that Salazar, Caesar, Plummer, Bent, or any other supervisor was aware that he had lost vision in one of his eyes, or evidence that any of them regarded him as having a vision impairment.  Failing to raise a question of fact as to whether he suffered from an ADA-protected disability, or that any such disability was the cause of his discharge or termination, Valenzuela's ADA claim must be dismissed.

CONCLUSION

Riverbay's April 19, 2007 motion for summary judgment is granted.  The Clerk of Court shall enter judgment for the defendant and close the case.

SO ORDERED:

Dated:    New York, New York
          August 24, 2007

                              DENISE COTE
                              United States District Judge

28

COPIES MAILED TO:

Paulino Valenzuela
120 Casals Place, Apt. 29A
Bronx, NY 10475

Mary A. Smith
Joseph A. Saccomano
Jackson Lewis LLP
1 North Broadway
White Plains, NY 10601